**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PATRICIA KROPF,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **No. 19-0971** |
| | : | |
| **TEMPLE UNIVERSITY HEALTH** | : | |
| **SYSTEM, INC., et al.,** | : | |
| *Defendants.* | : | |

## MEMORANDUM

**KENNEY, J.**                                                      **November 29, 2021**

Plaintiff Patricia Kropf brings this action against Temple University Health System, Inc., the American Oncologic Hospital d/b/a Fox Chase Cancer Center, the Fox Chase Cancer Center Medical Group, and Henry Fung, M.D., alleging Defendants unlawfully retaliated against her after she complained of sexual misconduct, harassment, and discrimination.  Dr. Kropf tried her claims to this Court from July 26 through July 30, 2021.  The Court will now address whether the Plaintiff proved retaliation under Title VII of the Civil Rights Acts of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII") and the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. §§ 951–63 ("PHRA").[1]  This Memorandum constitutes this Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a)(1).[2]

---

[1] The operative Complaint in this matter states claims for retaliation under Title VII and the PHRA, and Pennsylvania common law negligent hiring and/or retention and defamation.  ECF No. 45.  At the close of Plaintiff's case, Plaintiff stipulated to the dismissal of the negligent retention and negligent hiring claims.  Transcript of Proceedings (hereinafter "Tr.") (July 29, 2021) at p. 47.  Plaintiff has also voluntarily withdrawn her defamation claim.  ECF No. 95 at 51–52.  Given the dismissal of the defamation claim, Plaintiff has no remaining claims against Michael Dugan.  Therefore, the Court dismisses Mr. Dugan from the case.  Accordingly, the only claims remaining for judgment are for retaliation under Title VII and the PHRA against all remaining Defendants.

[2] To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

Over the course of the five-day trial, the Court was presented two distinct versions of the events at issue.  In Plaintiff's retelling, she communicated multiple times with her boss and other Temple/Fox Chase administrators to oppose sexual misconduct, discrimination, and harassment.  Per Plaintiff, her complaints dealt with inappropriate behavior by Dr. Fung at a gathering with subordinate employees immediately following a workplace function and her general concerns about the problematic culture of the workplace, which would be a protected activity.  Defendants assert that Plaintiff's account is a fabrication and instead the Plaintiff was solely complaining about her personal falling-out with Dr. Fung and his subsequent change in behavior towards her, which is not a protected activity.

## I.   <u>FINDINGS OF FACT</u>

Rule 52(a)(1) provides that "[i]n an action tried on the facts without a jury … the court must find the facts specially."  Fed. R. Civ. P. 52(a)(1).  This section contains the Court's findings on disputed facts raised by the parties during trial as well as the facts stipulated to by the parties and undisputed facts.  The burden is on the Plaintiff to demonstrate a factual and legal right to relief by a preponderance of the evidence.  *Parker v. Long Beach Mortg. Co*., 534 F. Supp. 2d 528, 535 (E.D. Pa. 2008).  The Court does not "view the evidence through a particular lens or draw inferences favorable to either party."  *McNeill v. United States, Dep't of Veterans Affs*., No. CV 20-105, 2021 WL 1998795, at *2 (E.D. Pa. May 19, 2021).  Rather, the Court will weigh the evidence, resolve disputes of fact, and make necessary witness credibility determinations to assess where the preponderance lies.  *Id.*

***General Background, Parties to the Case, and Other Relevant Individuals***

1.      Defendant Temple University Health System, Inc. ("TUHS") is an academic medical center located in Philadelphia, Pennsylvania.  Stipulations of the Parties for Trial, ECF No. 78 ("Stip.") ¶ 1.

2.      The American Oncologic Hospital d/b/a Fox Chase Cancer Center ("Fox Chase") is a comprehensive cancer center and a wholly owned subsidiary corporation of TUHS.  Stip. ¶ 2, 4.

3.      Defendant Fox Chase Cancer Center Medical Group, Inc. ("FCCC Medical Group") is the physician practice plan of the American Oncologic Hospital.  Stip. ¶ 3.

4.      Defendant Henry Fung, M.D. is a physician who was and continues to be the Director of the Fox Chase-Temple University Hospital Bone Marrow Transplant Program (the "BMT Program").  Stip. ¶ 6.

5.      Plaintiff Patricia Kropf, M.D. is a physician and was the Deputy Director of the BMT Program.  Stip. ¶ 5.

6.      Defendant Michael Dugan was employed by TUHS as the Operations Manager of the BMT Program at all times relevant to this dispute.  Stip. ¶ 7.

7.      Larry Kaiser, M.D. served as the Dean of the Temple University Lewis Katz School of Medicine, the President and Chief Executive Officer of TUHS, and the Senior Executive Vice President for Health Affairs for Temple University.  Stip. ¶ 8.

8.      Richard Fisher, M.D. at all times relevant to this dispute served as the Chief Executive Officer of Fox Chase.  Stip. ¶ 9.

9.      Susan Wiegers, M.D. at all times relevant to this dispute served as the Senior Associate Dean for Faculty Affairs for the Medical School.  Stip. ¶ 10.

10.     Philip Pancari, M.D. is a physician who, beginning in 2016 through the end of Dr. Kropf's employment, worked as an attending physician and junior faculty at Fox Chase in the hematology/oncology department and BMT Program.  Stip. ¶ 13.

11.     James Martin, M.D. is a physician who, at all times relevant to this dispute, was a fellow working at Fox Chase in the BMT Program.  Stip. ¶ 14.

12.     Brittany Cael, Pharm.D served as a pharmacist for the BMT Program.  Stip. ¶ 15.

13.     Beverly Sherbondy worked as Fox Chase's Assistant Vice President of Human Resources.  Stip. ¶ 18.

14.     Judith Bachman served as Fox Chase's Chief Operating Officer at all times relevant to this dispute.  Stip. ¶ 19.

15.     Edith Mayes-Kinkaid worked in the BMT program as an assistant to several physicians, including Dr. Kropf.  Tr. (July 26, 2021) at pp. 21–25.

16.     Dorothy Lang was the office supervisor for the BMT Program.  Tr. (July 26, 2021) at p. 52.

***Dr. Fung's Background and Employment with Fox Chase***

17.     Dr. Fung was born and educated in Hong Kong.  Tr. (July 29, 2021) at p. 99.

18.     After completing his residency in Hong Kong, Dr. Fung completed a two-year fellowship in leukemia and bone marrow transplant in Vancouver, Canada.  Tr. (July 29, 2021) at p. 99.  He then held positions at the University of British Columbia, the City of Hope National Medical Center in California, and the University of California at Irvine.  Tr. (July 29, 2021) at pp. 99–101.

19.      Immediately prior to starting at Fox Chase, Dr. Fung was employed by Rush University Medical Center in Chicago, Illinois.  Stip. ¶ 24.  Dr. Fung was employed at Rush from July 2002 until December 2013.  *Id.*

20.      At Rush, Dr. Fung was the Director of the Bone Marrow Transplant and Cell Therapy Section.  Tr. (July 26, 2021) at pp. 8, 17.

21.      In early 2014, the FCCC Medical Group hired Dr. Fung to serve as the Director of the BMT Program.  Stip. ¶ 23.

### Dr. Kropf's Background and Employment at Fox Chase

22.      Dr. Kropf received a Bachelor of Science from Boston College and her Medical Degree from Georgetown University School of Medicine.  Tr. (July 28, 2021) at p. 34.

23.      Dr. Kropf completed her internship, residency, and fellowship at the University of Pittsburgh Medical Center in Pittsburgh, Pennsylvania.  Tr. (July 28, 2021) at p. 34.

24.      Dr. Kropf began her employment with TUHS in 2009 as an Attending Physician and Assistant Professor of Medicine on the Clinician Educator Track.  Stip. ¶ 22.

25.      In early 2014, Dr. Kropf moved internally to Fox Chase as a member of the BMT Program and Assistant Professor of the Hematologic Service Line on the Academic Clinician track and became an employee of the FCCC Medical Group.  Stip. ¶ 25.

26.      In May 2016, Dr. Kropf became the Deputy Director of the BMT program.  Stip. ¶ 26.  Around the same time, she received a promotion to Associate Clinical Professor.  *Id.*

27.      As Deputy Director of the BMT program, Dr. Kropf was second-in-command of the BMT program.  Tr. (July 28, 2021) at p. 76.  Dr. Fung was Dr. Kropf's supervisor.  *Id.*

28.      For most of their time working together, Dr. Fung and Dr. Kropf enjoyed a productive working relationship and an extremely close personal friendship.  Stip. ¶ 27.

29. Under the leadership of Drs. Fung and Kropf between 2014 and 2018, the BMT program grew significantly in the number of patients it treated and improved the level of clinical care provided.  Tr. (July 29, 2021) at p. 105; Tr. (July 27, 2021) at pp. 109–10, Tr. (July 28, 2021) at p. 25.

30. During that time, the BMT program as a whole was a very social group, often meeting for happy hours and other social gatherings.  Tr. (July 26, 2021) at 28; Tr. (July 28, 2021) at p. 38.

31. On June 28, 2018, Dr. Kropf submitted a written letter of resignation to Dr. Fisher, with an effective date of August 24, 2018.  Stip. ¶ 29.

32. Dr. Kropf's last day of employment with Fox Chase was July 9, 2018.  Stip. ¶ 30.

***Dr. Fung and Dr. Kropf's Relationship***

33. Over the course of their time working together in the BMT Program, Drs. Kropf and Fung formed a close friendship, referring to one another as "family," "best friend forever," and "work wife/husband."  Stip. ¶ 27; Tr. (July 28, 2021) at pp. 37–38, 101; *see generally* Exhibit 145.

34. Drs. Fung and Kropf frequently expressed their mutual affection for and dependence on each other.  Both often said that they loved the other.  *See, e.g.*, Exhibit 145 at Fung 425, 444, 465, 476, 564.  In one instance, Dr. Kropf texted Dr. Fung that she told Dr. Kaiser, "We are one – will never separate.  Ever."  *Id.* at Fung 580.  She also said, "we definitely make a good team.  It's us and us alone."  *Id.*  In another exchange, in response to Dr. Kropf saying that she was overwhelmed and considering stepping back at work, Dr. Fung said, "I am nothing without you."  *Id.* at Fung 573.

35.     In the BMT Program, it was known amongst the staff that Dr. Fung and Dr. Kropf were very close friends.  Tr. (July 26, 2021) at pp. 26; 147–48.

36.     Dr. Kropf frequently socialized with Dr. Fung at happy hours, invited him to her home, and included him in family events and celebrations.  Tr. (July 28, 2021) at p. 104; Exhibit 145 at Fung 476.  Drs. Fung and Kropf drank together so frequently that they referred to alcohol as "water."  *Id.* at Fung 424, 444, 445, 446.

37.     Dr. Kropf was also significantly involved in Dr. Fung's life outside of work.  For example, Dr. Kropf visited Dr. Fung's adult daughter in New York City when she was struggling with a difficult breakup.  Tr. (July 28, 2021) at p. 104; Tr. (July 29, 2021) at p. 139; Exhibit 145 at Fung 541–43.

38.     By virtue of this close relationship, Drs. Kropf and Fung discussed intimate details of their personal lives.  *See, e.g.*, Tr. (July 29, 2021) at pp. 120–22; *see generally* Exhibit 145.  Both Dr. Kropf and Dr. Fung shared with each other their respective domestic disappointments.  Tr. (July 28, 2021) at p. 101; *see, e.g.*, Exhibit 145 at Fung 412, 503, 542–43, 570.

39.     Dr. Kropf was also involved in Dr. Fung's romantic life, introducing him to women and encouraging him to pursue relationships with them.  Tr. (July 28, 2021) at p. 102; Tr. (July 29, 2021) at p. 132.

40.     Dr. Kropf introduced Dr. Fung to an acquaintance, Sylvia Toymil-Rodriguez, with whom he began a romantic relationship.  Tr. (July 28, 2021) at p. 102; Tr. (July 29, 2021) at p. 132.  Dr. Fung referred to Dr. Kropf as the "matchmaker" for his relationship with Ms. Toymil-Rodriguez.  Exhibit 145 at Fung 483.

41.     Ms. Toymil-Rodriguez's and Dr. Kropf's children attended the same school.  Tr. (July 28, 2021) at p. 102.  Ms. Toymil-Rodriguez also worked occasionally as an interior designer for Dr. Kropf.  *Id.*

42.     Dr. Kropf encouraged and supported Dr. Fung's romantic relationship with Ms. Toymil-Rodriguez.  Tr. (July 29, 2021) at p. 132.  For instance, in May of 2017, Dr. Kropf texted Dr. Fung, "I think it is time that you make a purchase for Sylvia… She needs a nice piece of jewelry."  Exhibit 145 at Fung 380–81.  Dr. Fung then asked Dr. Kropf to buy something for Ms. Toymil-Rodriguez for $500, and she agreed.  *Id.* at 381.  In another instance, Dr. Kropf texted Dr. Fung—perhaps jokingly, perhaps not[3]—that she bought something at a sex shop for Dr. Fung and Ms. Toymil-Rodriguez.  Exhibit 145 at Fung 580.

43.     In December of 2017, Dr. Fung texted Dr. Kropf that Ms. Toymil-Rodriguez's husband hated Dr. Kropf and that Dr. Fung was "[n]ot sure [she] can still be [their] cover in 2018."  Exhibit 145 at Fung 482.  He also said, "Sorry to drag you into this.  Thanks for covering for us."  *Id.*

44.     Dr. Kropf often shared with Dr. Fung her struggles managing a very demanding job and the needs of her family.  For example, on July 20, 2017, Dr. Kropf texted Dr. Fung, "I know that you are disappointed in me for missing meetings.  I will do better.  But please know I am really trying my best and feel pulled in a million directions..."  Exhibit 145 at Fung 418–19.

45.     Five months later, on December 17, 2017, Dr. Kropf asked Dr. Fung to have Dr. Pancari cover some of her patients (and tell Dr. Pancari that she would be at another hospital, which was untrue) because she was "managing a lot."  Exhibit 145 at Fung 475.

---

[3] Dr. Kropf claimed this was a joke during her deposition, but Dr. Fung testified that the sex shop text was not a joke.  Tr. (July 29, 2021) at p. 133.

46.     Dr. Fung often provided emotional support in these conversations, saying once, for example, "[W]e have a very demanding job.  Very obvious to me, [your husband] is not sharing [the household responsibilities]."  Exhibit 145 at Fung 570.  In another instance, when Dr. Kropf texted that she was "truly at her breaking point" and that her husband had said he "can't [ ] have a wife who is this busy," Dr. Fung responded, "You can't have a husband [who is] this busy too.  Sorry, it's non-sense [sic].  He is a jerk."  Tr. 145 at Fung 453–54.  Dr. Fung later texted, "Let's sit down and talk and see how I can help."  *Id.* at 454.

47.     Several times, Dr. Fung offered to make changes at work to alleviate some of the burdens on Dr. Kropf.  *See, e.g.*, Exhibit 145 at Fung 454–55.  For example, Dr. Fung said via text, "If you don't want to do the research, you can give it up.  I don't care."  Exhibit 145 at Fung 570–71.  Dr. Fung also offered to start recruiting additional doctors to help her.  Tr. (July 28, 2021) at p. 128; Exhibit 145 at Fung 572.

48.     There is evidence Dr. Kropf was sometimes territorial in her relationship with Dr. Fung.  In September of 2017, Dr. Kropf texted Dr. Fung calling him a "TRAITOR" for going to Iron Hill Brewery with another doctor.  Exhibit145 at Fung 446.

*Spring 2018*

49.     Spring of 2018 was a particularly difficult time for Dr. Kropf with respect to her work and life balance.  Tr. (July 28, 2021) at pp. 118–21.

50.     On May 1, 2018, Dr. Kropf texted Dr. Fung saying, "I feel like a total failure every day … I don't do enough at work.  I am constantly reminded I don't do enough with the kids."  Exhibit 145 at Fung 569.  She said that she "cried every day" and worried that she was a "huge disappointment" to Dr. Fung and "embarrass[ed] [him] with her performance."  *Id*. at

Fung 570–71.  Dr. Kropf also said, "Part of me wants you to tell me I am not doing enough.

Then I can step back and be free."  *Id*. at 572.

51.     Dr. Fung was supportive of Dr. Kropf over this period, offering to cover for her at

work and calling her a "superstar" and a "hero."  Exhibit 145 at Fung 571–74.  Dr. Fung texted,

"I am worried and will support u."  *Id*. at 574.  Dr. Kropf responded, "I just get really

overwhelmed sometimes and feel like I am mediocre in all areas."  *Id*.  Dr. Fung replied, "Love

you" with an emoji.  *Id*.

52.     Dr. Kropf clearly wanted to keep her struggles private, as she texted Dr. Fung,

"And don't tell whomever you are with that I am like so sad."  Exhibit 145 at Fung 572.

***The In Vino Vita Gala***

53.     On April 21, 2018, Fox Chase held its annual fundraising event called the "*In*

*Vino Vita* Gala" ("*IVV*").  Stip. ¶ 28.  Both Drs. Kropf and Fung attended.  *Id.*  Ms. Toymil-

Rodriguez attended as well.  Tr. (July 28, 2021) at p. 107.

54.     Dr. Kropf and her husband drove Ms. Toymil-Rodriguez to the event, which was

held in Philadelphia.  Tr. (July 28, 2021) at p. 107.

55.     Some attendees found it odd or uncomfortable that Ms. Toymil-Rodriguez

attended the event "presumably together" with Dr. Fung.  Tr. (July 26, 2021) at p. 137.  Dr. Fung

had attended *IVV* with his wife the year before.  *Id.* at 136.

56.     Later in the evening, after *IVV* had ended, Dr. Fung, Ms. Toymil-Rodriguez, Dr.

James Martin, Dr. Martin's husband Tom Martin, and Ms. Cael went to R2L, a bar/restaurant in

the same building as Dr. Fung's condominium.  Tr. (July 26, 2021) at pp. 138–39, 163; Tr. (July

30, 2021) at p. 14.

57.     Dr. Kropf went home after *IVV* and did not join the group.  Tr. (July 28, 2021) at pp. 108–09.

58.     In the early hours of April 22, 2018, after R2L had closed, Dr. Fung invited the group to his condo for a glass of champagne.  Tr. (July 26, 2021) at pp. 164–65; Tr. (July 30, 2021) at pp. 14–15.

59.     At some point after they arrived at Dr. Fung's condo, Dr. Fung and Ms. Toymil-Rodriguez went into Dr. Fung's bedroom and separated from the group for a period of approximately 10–15 minutes.  Tr. (July 26, 2021) at pp. 139–41, 166; Tr. (July 30, 2021) at p. 15.

60.     Neither Dr. Martin nor Ms. Cael knew what Dr. Fung and Ms. Toymil-Rodriguez were doing in the other room.  Tr. (July 26, 2021) at pp. 139–40, 166; Tr. (July 30, 2021) at p. 15.  Dr. Martin testified that they "presumed" Dr. Fung and Ms. Toymil-Rodriguez were "being romantic."  Tr. (July 26, 2021) at p. 139.

61.     Dr. Martin and the other guests were unsure if they should leave.  Tr. (July 26, 2021) at pp. 139, 166.  It was an awkward situation and Dr. Martin felt uncomfortable.  Tr. (July 26, 2021) at pp. 139, 170; Tr. (July 28, 2021) at p. 110.  Ms. Cael testified that the situation did not make her feel uncomfortable.  Tr. (July 30, 2021) at p. 15.

62.     Shortly after Dr. Fung and Ms. Toymil-Rodriguez rejoined the group, Dr. Fung said that he was tired, so Dr. Martin, Mr. Martin, and Ms. Cael left Dr. Fung's condo and went home.  Tr. (July 26, 2021) at pp. 140–41, 167; Tr. (July 30, 2021) at pp. 15–16.

***Period Immediately Following In Vino Vita***

63.     The following day, on Sunday, April 22, 2018, Dr. Kropf and Dr. Fung briefly discussed *IVV* via text.  Tr. (July 28, 2021) at p. 112; Exhibit 145 at Fung 563–65.  Dr. Fung

texted Dr. Kropf, "Thank you for making this happens [sic].  It was a wonderful night."  Exhibit 145 at Fung 563.  Dr. Kropf later texted Dr. Fung, "Your girlfriend stole the show at *IVV*.  And she liked it!"  *Id.* at Fung 567.

64.     Dr. Kropf asked, "Didn't everyone go back to your place after?!"  Exhibit 145 at Fung 563.  Dr. Fung confirmed, and Dr. Kropf responded, "Lol!!!  Fun!!!!"  *Id*.

65.     Dr. Kropf later asked Dr. Fung, "Did you get a chance to be with Sylvia?"  Exhibit 145 at Fung 563.  Dr. Fung answered, "It was [sic] best!  We danced [sic] whole night and we had fun."  *Id.*  Dr. Kropf responded, "Yay!!!!!!!"  *Id.*

66.     The following Monday (April 23, 2018), Dr. Martin spoke with Dr. Kropf about what had happened at Dr. Fung's apartment after *IVV* and his assumption that Ms. Toymil-Rodriguez and Dr. Fung were "doing something romantic for that period of time."  Tr. (July 26, 2021) at pp. 142, 145, 168–69; Tr. (July 28, 2021) at pp. 40–43, 109–10.  Dr. Martin told Dr. Kropf that it was uncomfortable.  Tr. (July 26, 2021) at pp. 170, 173.  Dr. Martin testified he and Ms. Cael also probably chatted about the situation, specifically that it was "odd."  Tr. (July 26, 2021) at p. 144.

67.     According to Dr. Kropf, during this conversation, Dr. Martin's face turned very red and he said, "We were uncomfortable, we weren't sure what to do … it was very, very weird."  Tr. (July 28, 2021) at pp. 43–44.

68.     Dr. Kropf did not discuss or address any issue related to *IVV* or what happened afterwards with Dr. Fung on April 23, 2018, though they went to Iron Hill Brewery together that day.  Tr. (July 28, 2021) at pp. 44, 110–11, 116; Tr. (July 29, 2021) at pp. 122–23; Exhibit 145 at Fung 566–67.

69.     Dr. Kropf testified that, several weeks later, again at Iron Hill Brewery, Dr. Fung brought up the post-*IVV* gathering to her.  Tr. (July 28, 2021) at p. 44.  Dr. Kropf stated that Dr. Fung "bragged to me that Sylvia was giving him a blow job in his bedroom and he was turned on by the fact that the three of them were on the other side of the door."  *Id.* at 44–45, 111.

70.     Dr. Kropf testified that after this conversation with Dr. Fung she spoke with her husband and started to have concerns about the culture of the BMT Program.  Tr. (July 28, 2021) at pp. 45–48.  She started to think that it could cause problems for Dr. Fung, her, and the BMT Program as a whole.  *Id.*

71.     Dr. Fung denies he ever said anything to Dr. Kropf along the lines that it was a "turn on" for him to have oral sex with his girlfriend while other people were present in his condo.  Tr. (July 29, 2021) at p. 122.

***May 21, 2018 Monday Morning Meeting***

72.     Dr. Kropf claims that on May 21, 2018, following a Monday morning staff meeting, Dr. Kropf confronted Dr. Fung regarding the incident with Dr. Martin in Dr. Fung's condominium following *IVV*.[4]  Tr. (July 28, 2021) at p. 49.  Dr. Kropf testified that she said to Dr. Fung that his conduct with Ms. Toymil-Rodriguez had made Dr. Martin uncomfortable, was inappropriate, and could have consequences for the BMT Program.  *Id.* at 50.

73.     Dr. Kropf testified that she believed at the time that Dr. Fung's conduct violated discrimination laws where it made the other employees—particularly junior employees— uncomfortable.  Tr. (July 28, 2021) at pp. 50–52.  Dr. Kropf said that she expressed concern that

---

[4] On cross examination, Dr. Kropf admitted that she was not entirely sure of the date of the conversation and suggested that the meeting could have occurred on Tuesday.  Tr. (July 28, 2021) at pp. 136–37.

Dr. Martin was a fellow, or trainee, and that Dr. Fung's conduct could jeopardize TUHS's ACGME[5] status. *Id*.

74.     Dr. Kropf also claims that, during this conversation, she brought up with Dr. Fung his history with Human Resources, specifically referring to several sexual harassment complaints filed against him during his time at Rush Hospital. Tr. (July 28, 2021) at pp. 50–51. Dr. Kropf testified that she noted to Dr. Fung that a young, female pharmacist being present (Ms. Cael) when alcohol was involved could cause problems and might result in another Human Resources issue. *Id*. Dr. Kropf stated she advised Dr. Fung that she believed the culture of the program needed change if someone, particularly a subordinate employee, was made uncomfortable by it. *Id.*

75.     Dr. Kropf testified that Dr. Fung did not respond to her after she made these comments, and instead just angrily stood up and left. Tr. (July 28, 2021) at p. 52.

76.     Dr. Kropf claims that after this conversation, her relationship with Dr. Fung changed completely. Tr. (July 28, 2021) at p. 52. After that, he generally refused to speak with her and only spoke with her on a few occasions when absolutely necessary for patient care. *Id.* at 52–53. Dr. Kropf claims that Dr. Fung also began "checking up" on her with colleagues and publicly questioning her medical decision making. *Id.* at 53.

77.     Dr. Kropf testified that she "did everything [she] could" to try to fix their relationship, including repeatedly texting him and sending him a hand-written note, all to no avail. Tr. (July 28, 2021) at pp. 53–52.

---

[5] The Accreditation Council for Graduate Medical Education ("ACGME") is the body responsible for accrediting all graduate medical training programs for physicians in the United States. TUHS has specific anti-discrimination and harassment policies that apply to conduct involving employees in fellowship programs. Tr. (July 27, 2021) at p 78–79.

78.     Dr. Fung denies that the alleged May 21, 2018 conversation ever took place.  Tr. (July 27, 2021) at pp. 219–21; Tr. (July 29, 2021) at pp. 123, 137–38, 174.  Dr. Fung testified that Dr. Kropf never approached him to talk about the post-*IVV* incident.  *Id.*

79.     Though Dr. Kropf and Dr. Fung communicated via text extensively, there is no mention of this meeting in the texts exchanged between them.  Tr. (July 28, 2021) at pp. 202–03.

Faced with diametrically opposed testimony from the only witnesses, the Court must make a credibility determination and assess the circumstantial evidence.  Nothing in the demeanor of either witnesses testifying at trial would lead the Court to conclude that one was being more truthful than the other.  Both Drs. Kropf and Fung have obvious reasons to lie about whether this meeting took place.  Both also had inconsistencies in their testimony.  Dr. Kropf at first testified definitively that the claimed confrontation with Dr. Fung happened on Monday, May 21 after a Monday morning staff meeting, but then on cross examination, when asked about text messages she sent that morning that could undermine her version of events, conceded that it could have been on Tuesday.[6]  Tr. (July 28, 202¶1) at p. 136.  Dr. Fung was also inconsistent— he testified that he did not know why Mr. Dugan was collecting performance data on Dr. Kropf, but then later said Mr. Dugan was collecting the data in the normal performance of his job.

---

[6] Additionally, Dr. Kropf's testimony that, when she first approached Dr. Fung to have this conversation, she said to him, "I'm over the Sylvia incident" (*infra* at ¶ 88) is at odds with other evidence in the record.  For example, Ms. Sherbondy's notes (*infra* at ¶ 105) indicate that at their June 13, 2018 meeting, Dr. Kropf discussed the argument she had with Ms. Toymil-Rodriguez, and specifically detailed to Ms. Sherbondy that Ms. Toymil-Rodriguez told Dr. Kropf "things Henry said to her about [Dr. Kropf]."  Exhibit 53.  Further, in Dr. Kropf's hand-written note" (*infra* at ¶ 107), which she wrote in early June 2018, Dr. Kropf addressed the argument with Ms. Toymil-Rodriguez and detailed, point by point, her response to the criticisms Dr. Fung had reportedly made about Dr. Kropf.  This indicates that Dr. Kropf was still upset over Dr. Fung's confiding in Ms. Toymil-Rodriguez and undermines Dr. Kropf's claim that she was "over the Sylvia incident," or said that she was, in May of 2018.

*Compare* Tr. (July 29, 2021) at p. 160 *with* p. 154.  Therefore, the Court cannot determine based on credibility alone whose version of events to accept.

As the Court finds no reason to credit the testimony of one witness over the other on this point, it will look to the circumstantial evidence.  No contemporaneous written communication in the record supports the proposition that this meeting happened.  That absence is telling, as Dr. Kropf sent numerous texts and emails to Dr. Fung and others during this period.  When asked why Dr. Kropf did not include this meeting or her concerns about sexual misconduct or harassment in any written communication, Dr. Kropf's explanations were unpersuasive.  For example, she stated, without any elaboration, that Dr. Fung would "kill her" if she wrote that down anywhere or brought up that meeting.  Tr. (July 28, 2021) at pp. 147, 160.  Without some explanation or basis for this statement, the Court finds it unconvincing.

The record reflects that Dr. Kropf often texted Dr. Fung her unfiltered thoughts.  For example, on June 13, 2018, Dr. Kropf texted Dr. Fung that she hated him, that he was a "pathetic asshole," that he was "sick," and that she was going to tell Ms. Toymil-Rodriguez's husband about their extramarital relationship.  Exhibit 145 at Fung 586.  Earlier, on May 19, 2018, Dr. Kropf texted Dr. Fung that he "should be ashamed of [him]self."  *Id.* at Fung 584.  Dr. Kropf also called Dr. Fung's wife a "sociopath" and a "heartless bitch," apparently without fear of incurring Dr. Fung's wrath.  *Id.* at Fung 541, 542.  It is unclear to the Court what would distinguish these comments from a communication mentioning the post-*IVV* incident in such a way that it would cause Dr. Kropf to fear for her safety.

There is also nothing in the record that would indicate or even hint that Dr. Fung had any tendency towards violence.  Without some clarification from Dr. Kropf, the Court cannot see any other way to interpret Dr. Kropf's testimony except literally.  Dr Kropf even said that if she had

mentioned *IVV*, Dr. Martin, or ACGME in an email, Dr. Fung "would have killed me and none of us would be here [at trial] because I'd be dead." Tr. (July 28, 2021) at p. 157. The Court finds Dr. Kropf's proffered reason not believable.

Dr. Kropf also stated that she was trying to protect Dr. Martin (Tr. (July 28, 2021) at p. 160), but that explanation also does not hold water. Dr. Kropf could have made a complaint on his behalf without identifying him as the person who felt uncomfortable in the post-*IVV* incident, as Ms. Cael was also present. Dr. Kropf also could have simply stated that she was concerned about sexual harassment, discrimination, or misconduct generally without including identifying details at the onset. However, not a single written communication or the testimony of any witness supports that Dr, Kropf ever made a complaint that any witness interpreted to be a complaint about sexual harassment, discrimination, or misconduct. Dr. Kropf never gave any reason for why she could not have made a complaint without identifying Dr. Martin, when those options should have been obvious.

The only evidence in the record that Dr. Kropf confronted Dr. Fung in May 2018 about her concerns about his sexual misconduct, sexual harassment, or the culture of the BMT Program is her uncorroborated testimony. As such, the Plaintiff has not shown that it is more likely than not that this alleged confrontation occurred.

### Dr. Fung and Dr. Kropf's Personal Argument

80.     On or about May 17, 2018, Dr. Kropf had a conversation with Ms. Toymil-Rodriguez in Dr. Kropf's home. Tr. (July 28, 2021) at p. 130.

81.     Dr. Kropf stated that, during this conversation, Ms. Toymil-Rodriguez told Dr. Kropf that Dr. Fung had told her that Dr. Kropf was distracted at work, was not fulfilling her administrative duties as the Deputy Director of the BMT Program, was having Dr. Pancari cover

for her excessively and harming his career, and was pushing Dr. Fung to engage in another romantic relationship with a different woman. Tr. (July 28, 2021) at pp. 130–33; Exhibit 145 at Fung 582–84.

82.     Dr. Kropf felt deeply betrayed by Dr. Fung sharing these thoughts with Ms. Toymil-Rodriguez. Tr. (July 28, 2021) at p. 133. Dr. Kropf texted Dr. Fung at 7:10 p.m. on May 17, 2018, "You have broken my heart … Your girlfriend shared with me what you say about me… I feel like I lost my best friend (you) because you talk so much shit about me to her. I never ever ever would talk about you." Exhibit 145 at Fung 582–84. Dr. Kropf expressed to Dr. Fung how upset she was, saying "I can't stop crying. I trust you more than [my husband]. Why are you saying this about me? And it may be true but please TELL ME." *Id.* at 583.

83.     Dr. Fung responded apologizing and explained that he was "desperate," and that he shared that information with Sylvia as "pillow talks [sic]." Exhibit 145 at Fung 583.

84.     The following day, Dr. Kropf asked Dr. Fung to give her "space." Tr. (July 28, 2021) at p. 134. Then, at 12:16 a.m. on May 19, Dr. Kropf texted Dr. Fung, "I hope that you and your girlfriend are happy … You really should be ashamed of yourself given how you have spoken of me to her. I am truly saddened and disgusted." Exhibit 145 at Fung 584.

85.     Dr. Fung responded expressing his confusion about the situation, which Dr. Kropf did not respond to. Exhibit 145 at Fung 584. Dr. Fung then texted that he did not tell Ms. Toymil-Rodriguez "bad things" about Dr. Kropf, but that "how she interpret[s] what she see[s] and what she heard" was not under his control. *Id.*

86.     Two days later, on the morning of May 21, 2018, at 8:25 a.m., Dr. Kropf asked Dr. Fung to "play along" to a text she would be sending to him. Dr. Kropf anticipated that her husband would go through her phone as she had inadvertently sent an inappropriate text message

18

to a colleague and had a serious argument with her husband the night before.  Tr. (July 28, 2021) at pp. 137–38; Exhibit 145 at Fung 584–85.  Dr. Kropf's text said, "I am never ever ever drinking the rest of my life.  I hate myself … It was a horrible night for us both.  And totally my fault.  I am never ever ever drinking again."  Exhibit 145 at Fung 585.  Dr. Fung played along and responded, "Sorry.  Be careful with text" and shared that he had recently texted the wrong person a joke which made the recipient furious.  *Id.*

87.     At trial, Dr. Kropf testified that she sent these texts to Dr. Fung while they were in the Monday morning staff meeting.  Tr. (July 28, 2021) at p. 137.

88.     Dr. Kropf testified that when she approached Dr. Fung to discuss her concerns about the post-*IVV* incident and the culture of the BMT Program after that meeting, she first said to him, "I'm over the Sylvia incident."  Tr. (July 28, 2021) at p. 50.

89.     Dr. Fung subsequently travelled to San Francisco with his daughter.  Tr. (July 29, 2021) at pp. 138–41.  During this vacation, Dr. Fung learned that Dr. Kropf had suggested to his daughter that her mother (Dr. Fung's wife) had been abusive and that she and Dr. Fung were terrible parents.  *Id.*  Dr. Fung was extremely upset by this.  *Id.*

90.     On June 1, 2018, Dr. Kropf texted Dr. Fung, "Your silence has not gone unnoticed.  You truly have hurt me … you have declared your loyalty.  And I genuinely hope it works out."  Exhibit 145 at Fung 585; Tr. (July 28, 2021) at pp. 182–83.  Dr. Fung did not respond.  *Id.*

91.     On June 13, 2018, Dr. Kropf texted Dr. Fung, "Just so you know I met with Bev [Sherbondy].  And I truly HATE YOU … You pathetic asshole … You are sick."  Exhibit 145 at Fung 585–86; Tr. (July 28, 2021) at p. 184.

19

92.     In early June, Dr. Kropf sent a hand-written note to Dr. Fung in an attempt to

mend fences.  Tr. (July 28, 2021) at pp. 142–47; Exhibit 37.  In this card, Dr. Kropf wrote,

> "I have always felt that through it all you are my closest friend, ever.  This is why
> when Sylvia told me the things that you said, it hurt me very deeply.  And I do think
> that you said these things, as she knew details that she would have never known.
> So to think that you were criticizing my work performance—to her—was + is
> terribly hurtful."

Exhibit 37.  The letter responds several issues Ms. Toymil-Rodriguez relayed to her, including

Dr. Pancari covering for Dr. Kropf too often and Dr. Kropf not keeping up with research

expectations.  *Id.*  The letter does not mention any issues related to *IVV*.  *Id.*  At trial, Dr. Kropf

testified she did not mention *IVV* in the letter because "if [I] put in this letter a mention of the

Jimmy Martin situation, he would kill me."  Tr. (July 28, 2021) at p. 147.[7]

93.     Dr. Kropf texted Dr. Fung on June 22, 2018, saying "This is a long shot.  Do you

want to talk?  Can I call you?"  Exhibit 145 at Fung 586.  Dr. Fung did not respond.  *Id.*

**Dr. Kropf's Communications and Meeting with Mr. Dugan**

94.     Sometime in early June, Dr. Kropf went to Mr. Dugan, the BMT Operations

Director, to discuss the breakdown of her relationship with Dr. Fung.  Tr. (July 26, 2021) at pp.

179, 251–53.  Dr. Kropf stated that she wanted to ask Mr. Dugan if he had any advice on how to

handle the situation and "make Henry not mad at [her] anymore."  Tr. (July 28, 2021) at p. 54.

95.     In this meeting, Dr. Kropf told Mr. Dugan that Dr. Fung had begun checking up

on her with colleagues, would no longer look her in the eye, and would not talk to her.  Tr. (July

26, 2021) at pp. 179–80.  Mr. Dugan testified that he believed these seemed like interpersonal

---

[7] At trial, Dr. Kropf was asked why she never mentioned her complaints or concerns about the post-*IVV*
incident and sexual harassment or misconduct in any emails from this time period, Dr. Kropf again
responded—without any further explanation—that "He [Dr. Fung] would have killed me."  Tr. (July 28,
2021) at p. 157.

issues that were not within his purview as the Operations Director and suggested to Dr. Kropf

that she address the problem with Human Resources.  *Id.* at 180.

96.     When Dr. Kropf approached Mr. Dugan, she said that "something had happened

involving [Dr. Fung's] girlfriend and things were very tense."  Tr. (July 28, 2021) at p. 55.  Dr.

Kropf testified that she did not bring up the *IVV* issue with Mr. Dugan because that was not his

"jurisdiction;" she primarily went to him because he had a close working relationship with Dr.

Fung, so she thought he would have insight on fixing the relationship.  *Id.* 54–55.

97.     On June 13, 2018, following her in-person meeting with Mr. Dugan, Dr. Kropf

sent Mr. Dugan an email in which she said, "I am going to HR and it is going to be a horrible,

ugly mess.  However, I have tried to resolve this issue, which all stems from personal issues, that

never were about work… I can't work with a boss that suddenly without any discussion with me

(because he is upset over an issue involving his 'girlfriend') won't look at me…"  Exhibit 48; Tr.

(July 28, 2021) at p. 56.

98.     Also on June 13, 2018, Dr. Kropf sent an email to Dr. Fung, cc'ing Mr. Dugan,

addressing several problems in the workplace.  Exhibit 45.  In the email, Dr. Kropf noted how

these issues—Dr. Fung checking up on Dr. Kropf, questioning her medical judgment, giving her

a hard time her about vacation plans—only started "after your friend shared details with me that

never should have been discussed."  *Id.*  This referred directly to Dr. Kropf's May 17, 2021

argument with Ms. Toymil-Rodriguez.  Tr. (July 28, 2021) at p. 158.

99.     Mr. Dugan and Dr. Kropf met again on June 22, 2021.  Tr. (July 26, 2021) at pp.

232–33.  Mr. Dugan testified that he remained uninterested in any personal issues between Dr.

Kropf and Dr. Fung, so long as it did not affect the operational aspects of the BMT Program.  Tr.

(July 26, 2021) at p. 233.

21

100.    At that meeting, Dr. Kropf and Mr. Dugan must have discussed her attendance at work because afterwards Dr. Kropf texted Mr. Dugan, "You telling me 'you aren't here a lot' was the most honest thing I have heard in months.  I love it b/c it's the truth.  BTW – Not that I am proud of it.  But at least it's honest."  Exhibit 148; Tr. (July 28, 2021) at pp. 196–97.

*Dr. Kropf's Communications and Meeting with Ms. Sherbondy*

101.    On June 13, 2018, Dr. Kropf emailed Beverly Sherbondy, Fox Chase's Assistant Vice President of Human Resources, requesting a meeting.  Tr. Exhibit 47.

102.    Later that day, Dr. Kropf met with Ms. Sherbondy at 1:30 PM for approximately one hour.  Tr. (July 28, 2021) at pp. 164–69; Tr. (July 26, 2021) at pp. 79–80; Exhibit 53.  It is not disputed that this meeting occurred.  Tr. (July 26, 2021) at p. 80.

103.    During this meeting, Dr. Kropf claims she discussed all her problems with Dr. Fung: that there was an issue with his girlfriend, that Dr. Fung had possibly engaged in inappropriate sexual behavior following *IVV* in the presence of other employees, that he was questioning her medical decision-making and her whereabouts, asking about her vacation plans, and that he would not speak to her.  Tr. (July 28, 2021) at p. 56.

104.    At trial, Ms. Sherbondy did not recall that Dr. Kropf complained of sexual misconduct or harassment during this meeting.  Tr. (July 26, 2021) at pp. 81–88.  Ms. Sherbondy stated that Dr. Kropf instead spoke about her frustrations that Dr. Fung would not speak to her, challenged her decision-making, and was checking in about her with other employees, which Dr. Kropf found "mortifying."[8]  *Id*. at pp. 81, 105–08; Exhibit 53.  Dr. Kropf said in the meeting that she felt the workplace had become "tense" and "hostile."  Exhibit 53.

---

[8] Other witnesses corroborate that when Dr. Fung did not like or trust someone, he would stop speaking to them and possibly try to undermine them in the workplace.  Tr. (July 26, 2021) at pp. 45–47, 55–61.

105.    Ms. Sherbondy's contemporaneous notes from that meeting reflect that Dr. Kropf stated that Dr. Fung's behavior had "changed completely" in the few weeks before the meeting, which she attributed to "something going on in his personal life."  Exhibit 53.  Dr. Kropf told Ms. Sherbondy that Dr. Fung's "girlfriend" had shared with Dr. Kropf things Dr. Fung had said about her work performance.  *Id.*  At the end of the meeting, Dr. Kropf thanked Ms. Sherbondy and said she was sorry for bringing the issue to her and that she felt very embarrassed.  *Id.*

106.    In her deposition, Ms. Sherbondy testified that Dr. Kropf told her about the post-*IVV* incident at their meeting.  Exhibit 175 at pp. 79–80.  At trial, Ms. Sherbondy stated that she did not recall exactly what Dr. Kropf said in their meeting or how much detail Dr. Kropf relayed to her.  Tr. (July 26, 2021) at pp. 84–88.  Ms. Sherbondy characterized Dr. Kropf's mention of the *IVV* incident as a "passing remark" and asserted that Dr. Kropf was more focused on Dr. Fung ignoring her and checking up on her.  *Id.* at 90–91.  Ms. Sherbondy's contemporaneous notes do not reflect any discussion of *IVV*, Dr. Martin, sexual misconduct or sexual harassment, or concerns about ACGME accreditation.  Exhibit 53.

107.    At trial, Dr. Kropf testified that, during their meeting, Ms. Sherbondy did not write down anything during their discussion of the *IVV* incident or note that Dr. Fung had stopped talking to her after she approached him about that.  Tr. (July 28, 2021) at 57–58, 168–69, 172.

108.    At trial, Ms. Sherbondy testified that she did not perceive Dr. Kropf to be complaining about a hostile work environment, sexual misconduct, or gender discrimination at the time of the meeting.  Tr. (July 26, 2021) at p. at 109.  Ms. Sherbondy believed that Dr. Kropf's complaints concerned personal problems between her and Dr. Fung.  *Id.* at 100–01.

109.    After this meeting, Ms. Sherbondy scheduled an additional meeting between Drs. Kropf and Fung for June 27, 2018, which was to be facilitated by Ms. Sherbondy and Ms. Bachman.  Tr. (July 26, 2021) at pp. 81–82.  That meeting was later cancelled.  *Id.* at 93.

110.    On June 22, 2018, Dr. Kropf and Ms. Sherbondy met again briefly.  Exhibit 175 at pp. 41–42; Exhibit 69; Tr. (July 26, 2021) at pp. 93–95; Tr. (July 28, 2021) at pp. 71–72.  At that meeting, Dr. Kropf told Ms. Sherbondy that August 20, 2018 was going to be her last day of employment.  Exhibit 175 at p. 41.

Again faced with inconsistent testimony, the Court will assess the credibility of the witnesses and the circumstantial evidence.  Dr. Kropf testified that she told Ms. Sherbondy her concerns about sexual harassment and misconduct, but Ms. Sherbondy did not recall that.  Ms. Sherbondy's contemporaneous notes do not reflect that Dr. Kropf discussed *IVV*, Dr. Martin, or the issue with the BMT Program's ACGME accreditation at the June 13, 2018 meeting.  While Ms. Sherbondy recalled that Dr. Kropf told her about the *IVV* incident, she said that it was a "passing remark" and that she understood Dr. Kropf to be complaining about a personal issue. This version of events is supported by Ms. Sherbondy's subsequent act of scheduling a facilitated meeting to resolve the issue, rather than opening an investigation.  Further, Dr. Kropf did not respond to Ms. Sherbondy's email setting up the subsequent meeting, or communicate to Ms. Sherbondy ever, that a facilitated meeting was an inappropriate solution to the issues she raised.  It does not appear from the record that Dr. Kropf ever said to anyone that she had voiced concerns about illegal conduct which was not being handled properly.  Thus, the Court finds that Dr. Kropf's meeting with Ms. Sherbondy was not a protected activity under Title VII because it is more likely that Dr. Kropf was complaining about a personal problem and mistreatment by Dr. Fung, not sexual harassment, misconduct, or discrimination.

***Dr. Kropf's Communications and Meetings with Ms. Bachman***

111.    On June 13, 2018, Dr. Kropf also sent a text message to Ms. Bachman, the Chief

Operating Officer for Fox Chase, that "something is very wrong" with how Dr. Fung was

treating her.  Exhibit 54.  Dr. Kropf reached out to Ms. Bachman because of her leadership

position, which made Dr. Kropf believe she would have insight on resolving the issue.  Tr. (July

28, 2021) at pp. 60–61.

112.    At trial, Ms. Bachman did not recall that Dr. Kropf came to her with concerns

about Dr. Fung, nor did she recall the meeting she had with Dr. Kropf.  Tr. (July 27, 2021) at pp.

59–63.

113.    Dr. Kropf testified that she spoke with Ms. Bachman on the phone and told her all

the issues she was having with Dr. Fung, including the post-*IVV* incident and that Dr. Fung had

stopped speaking to her after she confronted him.  Tr. (July 28, 2021) at p 61–62.

Ms. Bachman responded that she believed Ms. Sherbondy was going to organize a facilitated

meeting and gave Dr. Kropf the Employee Assistance phone number.  *Id.* at 62.

While the record supports a finding that Dr. Kropf and Ms. Bachman did speak at some

point regarding Dr. Kropf's complaints about Dr. Fung, for similar reasons to those stated above

(*see supra* pp. 15–17, 24), the Court finds that Dr. Kropf has not proven by a preponderance of

the evidence that the concerns she articulated to Ms. Bachman were about anything other than

her personal falling-out with Dr. Fung and his subsequent ill-treatment of her in the workplace.

***Dr. Kropf's Communications and Meeting with Dr. Wiegers***

114.    On June 13, 2018, Dr. Kropf emailed Dr. Susan Wiegers, the Senior Associate

Dean of Faculty Affairs and Senior Associate Dean of Graduate Medical Education for the Lewis

Katz School of Medicine, asking to speak with her because she had "several issues over the last

month involving another faculty member." Exhibit 46; Tr. (July 28. 2021) at pp. 63–64. Dr.
Eric Kropf had suggested that Dr. Kropf speak with Dr. Wiegers, though she did not have
jurisdiction over FCCC faculty. Exhibit 46.

115.   At trial, Dr. Wiegers stated that Dr. Eric Kropf, whom she worked with and had
appointed to her Executive Council, mentioned to her prior to Dr. Kropf's reaching out that his
wife was having some problems with a faculty member at Fox Chase. Tr. (July 29, 2021) at p.
88. Dr. Wiegers testified that she was happy to have a friendly conversation with Dr. Kropf—
though she would not be taking any kind of official complaint—and that she often spoke with
women seeking professional advice. *Id.* at 88–89.

116.   Dr. Kropf emailed Dr. Wiegers again on June 22, 2018, "at the insistence of [her]
husband." Exhibit 71. Dr. Kropf asked to speak on the phone with Dr. Wiegers and said, "I am
so sorry to burden you with what I know to be mundane and pathetic workplace issues." *Id.*

117.   Dr. Kropf and Dr. Wiegers had a conversation on the phone, where Dr. Kropf told
Dr. Wiegers that she was having serious issues with her boss and did not know what to do. Tr.
(July 28, 2021) at p. 68; Tr. (July 29, 2021) at pp. 92–93. Dr. Wiegers stated that it would be
better for Dr. Kropf to deal with Fox Chase Human Resources because she was a Fox Chase
employee. Tr. (July 28, 2021) at p. 68.

118.   Dr. Kropf knew that Dr. Wiegers had responsibility over Temple's GME Program
but did not tell Dr. Wiegers that her concerns with the other faculty member or her issues with
her boss concerned both a fellow and TUHS's ACGME accreditation. Tr. (July 28, 2021) at p.
64; 160; Tr. (July 29, 2021) at p. 93.

119.   Dr. Wiegers testified that Dr. Kropf "absolutely [did] not" mention anything on
their call about sexual misconduct involving a fellow. Tr. (July 29, 2021) at p. 93. She was sure

of this because the fellows in residence were her responsibility and she always, "even if the story is a crazy whack story," reported any allegations.  *Id.* at pp. 93–94.

Again, the Court cannot credit Dr. Kropf's account of her communications with Dr. Wiegers.  Dr. Wiegers was confident at trial that Dr. Kropf's complaints did not indicate any potential Title VII violation because that would have been reported.  Dr. Kropf's own communications undermine her description because it would be incongruous to describe serious sexual misconduct as a "pathetic and mundane workplace issue[ ]."  Rather, it is more likely that Dr. Kropf was describing her personal argument with Dr. Fung and their subsequent inability to work together in a professional manner.  Dr. Kropf also conceded that she knew that Dr. Wiegers was responsible for Temple's GME program but did not tell her that the issue involved a fellow or ACGME accreditation.  Therefore, the Court cannot find that it is more likely than not that Dr. Kropf's meeting with Dr. Wiegers dealt with conduct prohibited by Title VII and not her personal issues with Dr. Fung.

### Dr. Kropf's Communications and Meeting with Dr. Goldberg

120.    Dr. Kropf also reached out to Dr. Goldberg, who was at that time Chairman of Surgery at Temple Health.  Tr. (July 28, 2021) at p. 68.  Dr. Kropf believed that Dr. Goldberg might be able to help her because Dr. Goldberg was a woman on the Executive Physician Committee.  *Id.*  Up until that point, the only response Dr. Kropf had received from anyone in the Temple/Fox Chase administration or Human Resources was the email from Ms. Sherbondy setting up the facilitated meeting.  *Id.* at 68–69.

121.    On June 22, 2018, Dr. Kropf forwarded Dr. Goldberg her emails with Dr. Wiegers and said, "Amy.  I am truly at a loss.  I am embarrassed to email you.  Any chance we could speak?"  Exhibit 71.

122.    Dr. Kropf testified that she spoke with Dr. Goldberg and conveyed her concerns about Dr. Fung, what Dr. Martin told her about going to Dr. Fung's condo after *IVV*, and that the work environment had become hostile.  Tr. (July 28, 2021) at p. 69.  Dr. Goldberg suggested to Dr. Kropf that she try to come up with ways that she and Dr. Fung could work better together. *Id.* at 69–70.

123.    At trial, Dr. Goldberg recalled having a conversation with Dr. Kropf.  Tr. (July 30, 2021) at p. 4.  Dr. Goldberg remembered that Dr. Kropf was very upset that her friend who was a decorator had become friends with Dr. Fung and that Dr. Fung and the friend were having conversations.  *Id.*  Dr. Goldberg testified that Dr. Kropf never raised any concerns about Dr. Fung's behavior with a fellow or the BMT Program's ACGME accreditation.  *Id.* at 4–5.  Dr. Goldberg was confident that Dr. Kropf never mentioned any of this to her because that would have been a serious allegation which would have been acted upon immediately.  *Id.* at 5.

The Court finds that Dr. Kropf's conversation with Dr. Goldberg more likely dealt entirely with her complaints about Dr. Fung's treatment of her in the workplace and their inability to work together after he betrayed her confidence.  Dr. Goldberg testified confidently that she was definitely not told of any misbehavior with a fellow that could jeopardize the BMT Program's ACGME accreditation.  Further, Dr. Kropf said in her email to Dr. Goldberg that she was "embarrassed" to be contacting her.  The Court finds is more likely that Dr. Kropf was embarrassed to be reaching out to Dr. Goldberg because the issue was that she was having a personal problem with Dr. Fung, not that she had concerns about sex discrimination or harassment in the BMT Program.

***Dr. Kropf's Resignation***

124.     On June 28, 2018, Dr Kropf met with Dr. Fisher to tender her resignation.  Tr. (July 28, 2021) at pp. 14, 70, 82–83.  Dr. Fischer did not ask Dr. Kropf why she was resigning and did not try to talk her out of it.  *Id.* at 16–18.  Dr. Fisher stated that, because she came into his office with her written resignation letter already prepared, he did not think there was much point in trying to dissuade her.  *Id.* at 18, 27.

125.     That same day Dr. Kropf met with Mr. Dugan for the second time and told him she was going to leave because she did not see any other way out of the situation.  Tr. (July 28, 2021) at pp. 70–71.  Dr. Kropf also met briefly with Ms. Sherbondy that day and told her she was resigning.  *Id.* at 71–72.

126.     Dr. Kaiser, the Dean of the Temple University Medical School and CEO of TUHS, was not informed of Dr. Kropf's imminent resignation.  Exhibit 92; Exhibit 94; Exhibit 96.

127.     Dr. Kaiser knew Dr. Kropf's husband, Dr. Eric Kropf, very well because he was the Chair of Orthopedic Surgery at TUHS and had appointed him to that role.  Tr. (July 27, 2021) at pp. 95–96.

128.     Dr. Kasier knew Dr. Kropf from work-related social events and knew of her reputation as "the hardest worker" with a "busy practice" and as a "superb clinician."  *Id.* at 96.  Dr. Kropf told people that Dr. Kaiser "loved" her.  Tr. (July 28, 2021) at p. 105.[9]

129.     Dr. Kaiser was told of Dr. Kropft's resignation by another doctor.  Tr. (July 27, 2021) at p. 96.  Dr. Kaiser was upset at her resignation, saying in an email, "there goes the [BMT] [P]rogram … this is a disaster."  Exhibit 92.

---

[9] Dr. Kropf texted Dr. Fung in mid-May 2018, "Kaiser will do ANYTHING for me."  Exhibit 145 at Fung 580.

130.    On June 29, 2018, Dr. Kaiser emailed Dr. Kropf to set up a call to discuss her resignation.  Exhibit 95.  At trial Dr. Kaiser testified, "I was concerned about the abrupt nature of this resignation, not having any prior knowledge that this was coming, and running a large organization, surprises are not necessarily a good thing, so I really wanted to know what [ ] precipitated this and whether or not this was leaving because she had another job or what was the issue."  Tr. (July 27, 2021) at p. 100.

131.    That day, Dr. Kropf texted Mr. Dugan that she had a "very loud and emotional conversation with Dr. Kaiser … He won't accept my resignation."  Exhibit 148.

132.    On their call, Dr. Kaiser learned that Dr. Kropf was not resigning because she had another job; rather, she was leaving because of the work environment and the demands of working in the BMT Program.  Tr. (July 27, 2021) at pp. 100–01.

133.    Also on June 29, 2018, presumably after Dr. Kropf spoke with Dr. Kaiser, Dr. Kropf forwarded to Dr. Kaiser an email from Mr. Dugan in which Mr. Dugan said that he would not be compiling information Dr. Kropf had requested for the time being.  Exhibit 97.  Dr. Kropf wrote in the email to Dr. Kaiser, "The below is yet another example of what has led to my current resignation."  *Id.*

134.    Dr. Kaiser also emailed Dr. Eric Kropf about Dr. Kropf's resignation asking for more information and reiterating his belief that her resignation was "a disaster."  Exhibit 96.

135.    On July 3, 2018, Dr. Kaiser sent an email to Dr. Fisher, the CEO of Fox Chase, in which he stated that he was "very upset with the way things have come down for [Dr.] Kropf."  Exhibit 108.  Dr. Kaiser thought the circumstances of her leaving indicated that there was a problem in the program, and suspected that the source of this problem was Dr. Fung.  Tr. (July 27, 2021) at p. 102.

136.     On July 9, 2018, Dr. Kaiser again emailed Dr. Fisher regarding Dr. Kropf's resignation.  Exhibit 119.  In this email, Dr. Kaiser stated, "it[']s too bad Henry stays and she goes at least based on what I've heard regarding Henry's behavior."  *Id.*  Dr. Kaiser was upset with Dr. Fisher that he could not "somehow manage these two people to get them to be able to interact in a way that's professional and that could be a reasonable working environment."  Tr. (July 27, 2021) at p. 104.

137.     Also on July 9, 2018, Dr. Kaiser said in an email to another physician, "[Dr. Kropf] is a superb physician who worked harder than anyone else.  Henry Fung is the problem." Exhibit 120.

138.     Dr. Kaiser testified that Dr. Fung had a reputation of being a "difficult administrator."  Tr. (July 27, 2021) at pp. 107, 109–10.  Dr. Kaiser was not told that Dr. Kropf had complained that Dr. Fung had engaged in any kind of inappropriate sexual behavior and had no reason to be concerned that Dr. Fung was sexually harassing employees in the BMT Program. Tr. (July 27, 2021) at p. 110, 116, 118.

139.     On Monday, July 9, 2018, Dr. Kropf worked her last day at Fox Chase.  Tr. (July 28, 2021) at p. 84.  Dr. Kropf had intended to work until August but left early because she "clearly wasn't wanted and the tension was terrible."  Tr. (July 28, 2021) at pp. 86, 98.

140.     Dr. Kropf called her secretary, Ms. Kinkaid, after seeing her last patient.  Tr. (July 26, 2021) at p. 30.  Dr. Kropf was upset about leaving Fox Chase and the BMT Program, crying on the phone with Ms. Kinkaid and saying that she did not want to leave her patients.  *Id*. at p. 31.

## II.     <u>CONCLUSIONS OF LAW</u>

In order to prevail on her claims, the Plaintiff must prove by the preponderance of the evidence that the Defendants retaliated against her in violation of Title VII and the PHRA.

Title VII[10] prohibits employers from retaliating against any employee because the employee opposed any race or gender discrimination by the employer or participated in certain Title VII proceedings.  *Alers v. City of Phila.*, 919 F. Supp. 2d 528, 547 (E.D. Pa. 2013) (citing 42 U.S.C. § 2000e-3(a)).  The anti-retaliation provision of Title VII provides, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).  This provision protects those who participate in certain proceedings (the "participation clause") and those who oppose discrimination made unlawful by Title VII (the "opposition clause").  *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006).  The "participation clause" offers broader protection to Title VII employees than the "opposition clause."  *Slagle v. Cty. of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006).  Protected "opposition" activity includes not only the filing of formal charges of discrimination against an employer, but also "informal protests of discriminatory employment practices, including making complaints to management."  *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015) (citation omitted).  Here, Plaintiff claims that she engaged in protected activity because she opposed Dr. Fung's conduct, which she reasonably believed to be unlawful sexual harassment.

To establish a *prima facie* case of retaliation under Title VII and the PHRA, Dr. Kropf must prove that (i) she engaged in protected activity; (ii) the Defendants took an adverse

---

[10] The Third Circuit interprets PHRA claims coextensively with Title VII claims.  *Douris v. Genaurdi's Family Markets, Inc.*, 132 Fed. Appx. 425, 425 n.1 (3d Cir.2005) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

employment action against her, and (iii) a causal connection existed between her protected activity and the adverse action. *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995).

General complaints of mistreatment are not protected activity under Title VII. *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006); *see also Ahmed v. Lowe's Home Centers, Inc.*, 346 F. App'x 816, 819 (3d Cir. 2009). To constitute a protected activity, the employee must have an objectively reasonable belief, in good faith, that the activity he or she is opposing is unlawful under Title VII. *Id.* (citing *Clark County v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam)); *Slagle*, 435 F.3d at 267 (an employee is only protected if the charge is brought under 42 U.S.C. §§ 2000e through 2000e–17, i.e. if the charge alleges discrimination on the basis of a prohibited grounds). The employee is protected even if he or she is mistaken on the merits of the claim. *Slagle*, 435 F.3d at 268. Opposing discrimination on behalf of another is protected activity. *Aguiar v. Morgan Corp.*, 27 F. App'x 110, 112 (3d Cir. 2002) (finding that the plaintiff engaged in protected activity where he made a statement for a black co-worker who had filed a complaint of race discrimination). A plaintiff is required to show only "that '[she] was acting under a good faith, reasonable belief that a violation existed.'" *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996) (citing *Griffiths v. Cigna Corp.*, 988 F.2d 457, 468 (3d Cir. 1993)).

In the Third Circuit, a plaintiff can demonstrate a violation of Title VII by proving that sexual harassment created a hostile or abusive work environment. *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999). Conduct of a sexual nature can constitute sexual harassment where such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. *Austin v. Norfolk S. Corp.*, 158 F. App'x 374, 377 (3d Cir. 2005) (quoting 29

C.F.R. § 1604.11).  Generally, such conduct must be "pervasive and severe."  *Id.*  An isolated

incident of sexual misconduct is not actionable under Title VII except in "exceptional cases"

where the misconduct is "extremely serious."  *Priller v. Town of Smyrna*, 430 F. Supp. 2d 371,

379 (D. Del. 2006).

Plaintiff alleges she engaged in "numerous" instances of protected activity.  ECF No. 95

at 44.  Plaintiff's claimed protected actives are: objecting to Dr. Fung directly in mid-May 2018

that Dr. Fung's conduct after *IVV* violated Title VII's sex discrimination provisions; meeting in

person with Mr. Dugan and Ms. Sherbondy on June 13, 2018; and reporting to Ms. Bachman and

Dr. Wiegers over the following days that Dr. Fung had engaged in sex discrimination and was

retaliating against her.  Plaintiff asserts that these are protected activities because she reasonably

believed that Dr. Fung's conduct toward Dr. Martin and his retaliatory actions toward her after

she confronted him constituted violations of Title VII.

Defendants argue that Dr. Kropf never engaged in any protected activity because she

never complained about any conduct prohibited under Title VII.  To the contrary, her complaints

about Dr. Fung were of a purely interpersonal nature, stemming from the dissolution of her close

friendship with Dr. Fung, rather than any unlawful behavior.  Defendants emphasize that the

only evidence that supports Dr. Kropf's version of events is her own uncorroborated testimony.

Dr. Kropf's first claimed instance of protected activity was her confrontation with Dr.

Fung following the Monday morning meeting (that may have occurred on Tuesday) on May 21,

2018, in which she claimed she raised concerns about the culture of the BMT Program and Dr.

Fung's conduct with subordinate employees.  As discussed above (*see supra* pp. 15–17), the

Court cannot credit Dr. Kopf's version of events.  The only evidence Plaintiff brought forward

was her uncorroborated testimony, which was not sufficient in light of the lack of support from

any contemporaneous written communication or other circumstantial evidence.  In light of the

Court's conclusions that her complaints dealt solely with her personal falling-out with Dr. Fung

and his consequent change in treatment towards her in the workplace (*see supra* pp. 24, 25, 26–

27, 28), the Court will credit Dr. Fung's version of events and find that Dr. Kropf never met with

him to oppose any sexual harassment, misconduct, or discrimination in the workplace.

Dr. Kropf also claims that her June 2018 meeting with Mr. Dugan, the Operations

Manager of the BMT Program, constituted protected activity, but nowhere did she claim that she

discussed concerns about harassment, discrimination, or sexual misconduct with Mr. Dugan.  At

trial, Dr. Kropf testified that she did not bring up the *IVV* issue with Mr. Dugan because that was

not his "jurisdiction" and that she instead was seeking his advice for making Dr. Fung "not mad

at [her] anymore." Tr. (July 28, 2021) at p. 54.  Additionally, in Dr. Kropf's June 13, 2018 email

to Mr. Dugan, she said that the problem "all stems from personal issues, that never were about

work" and that she could no longer work with a boss who would not speak to her "because he is

upset over an issue involving his 'girlfriend.'" Exhibit 48.  These statements fatally undermine

Dr. Kropf's claim that she was complaining about conduct prohibited by Title VII.  Mr. Dugan

also testified that he believed Dr. Kropf's meeting to be about an interpersonal dispute with Dr.

Fung that had something to do with Dr. Fung's girlfriend.  Tr. (July 26, 2021) at 180.  While it is

not disputed that this meeting took place, as found by the Court, the credible evidence establishes

that the meeting concerned personal issues or "[a] general complaint of unfair treatment," which

is not protected activity under Title VII.  *Curay-Cramer*, 450 F.3d at 135.[11]

---

[11] This meeting cannot constitute protected activity if viewed as Dr. Kropf complaining about retaliation from Dr. Fung because the Court has determined that the Plaintiff has not proved by a preponderance of the evidence that she engaged in any protected activity prior to Dr. Fung's change in behavior towards her. *See supra* pp. 15–17, 34.

Dr. Kropf similarly claims that her meeting with Ms. Sherbondy, Fox Chase's Assistant Vice President of Human Resources, was a protected activity.  Dr. Kropf claims that she discussed all her issues with Dr. Fung at this meeting, including that she suspected that Dr. Fung had possibly engaged in inappropriate sexual behavior following *IVV* in the presence of other employees.  Tr. (July 28, 2021) at p. 56.  Ms. Sherbondy did not recall that Dr. Kropf complained of sexual misconduct or harassment during this meeting.  Tr. (July 26, 2021) at pp. 81–88.  While Ms. Sherbondy conceded that Dr. Kropf told her about the *IVV* incident in that meeting, she testified that it was merely a "passing remark" and that Dr. Kropf was more concerned with Dr. Fung refusing to speak to her and checking up on her.  *Id*. at 90–91.  Ms. Sherbondy's contemporaneous notes from the meeting do not mention sexual misconduct, harassment, or discrimination.  Exhibit 53.  Rather, they reflect that Dr. Kropf discussed the changes in Dr. Fung's treatment of her and that the workplace had become "tense" and "hostile." Exhibit 53.  Ms. Sherbondy testified that at the time she did not perceive Dr. Kropf's complaint to be about anything other than an interpersonal dispute.  Tr. (July 26, 2021) at pp. at 100–01. Based on the foregoing, the Court finds that this meeting does not constitute protected activity, as the Plaintiff has not shown that it was more likely than not that she was complaining about conduct prohibited by Title VII instead of her personal falling-out with Dr. Fung.

Dr. Kropf made similar claims about her meetings and communications with Ms. Bachman, Dr. Wiegers, and Dr. Goldberg.  The Court comes to the same conclusion.  Dr. Kropf's uncorroborated testimony is the only evidence in the record that supports the proposition that these meetings and communications were protected activity under Title VII, and not complaints about an interpersonal problem or general mistreatment.  Ms. Bachman did not recall that Dr. Kropf came to her at all with complaints about Dr. Fung.  Tr. (July 27, 2021) at pp. 59–

63.  Dr. Wiegers remembered her conversation with Dr. Kropf as dealing with her issues with her boss but testified that Dr. Kropf "absolutely [did] not" mention anything on their call about sexual misconduct involving a fellow.  Tr. (July 29, 2021) at p. 93.  Dr. Kropf acknowledged that she never told Dr. Wiegers about Dr. Martin despite knowing that Dr. Wiegers at the time had responsibility over the administration of Graduate Medical Education.  Tr. (July 29, 2021) at p. 93.  Dr. Kropf's email to Dr. Wiegers supports Dr. Wiegers' recollection because Dr. Kropf wrote, "I am so sorry to burden you with what I know to be mundane and pathetic workplace issues."  Exhibit 71.  It is difficult to believe that Dr. Kropf would describe serious sexual misconduct as "mundane and pathetic."  It is more likely that Dr. Kropf described the situation as "mundane and pathetic" because it had to do with petty interpersonal problems—Dr. Fung saying negative things about Dr. Kropf to his girlfriend and breaking Dr. Kropf's confidence— and not sexual harassment or discrimination.  Dr. Goldberg was equally emphatic that Dr. Kropf never complained to her about misconduct involving a fellow because that would have been a serious allegation that would be acted upon immediately.  Tr. (July 30, 2021) at pp. 4–5.  The Court finds the testimony of Drs. Wiegers and Goldberg convincing, as both women, accomplished doctors and leaders in their field, took great umbrage at the allegation that they would receive a report of serious sexual misconduct involving a fellow and not handle it appropriately.

The timeline of events and Dr. Kropf's other actions—or inactions—supports Defendants' version of events on this point.  Dr. Kropf says that she first became concerned about possible sexual harassment, misconduct, and discrimination in the BMT Program in mid- to late May 2018.  Tr. (July 28, 2021) at p. 45.  She then met with Dr. Fung on May 21, 2018 and confronted him with her concerns.  *Id.* at p. 49.  Her other meetings and communications

followed, beginning with Dr. Kropf's meeting with Mr. Dugan in early June and with Ms.

Sherbondy on June 13, 2018.  Dr. Kropf then tendered her resignation on June 28, 2018.  *Id.* at

14.  This strikes the Court as a particularly short period of time for an employee to pursue claims

of sexual harassment or discrimination in the workplace, especially when those claims are raised

on behalf of another employee.  Dr. Kropf claims that Dr. Fung's mistreatment of her made the

workplace unbearable, but that is something she endured for only a matter of weeks, at least one

of which Dr. Fung was in California and not in the office.[12]  Tr. (July 29, 2021) at pp. 138–41.

Dr. Kropf was also on vacation in Avalon, New Jersey for part of this time.  Tr. (July 28, 2021)

at p. 61.  It is not credible that this treatment alone would drive a highly compensated individual,

trained for years in a specific medical specialty, to resign abruptly from a job that she loved.  *Id.*

at 58.[13]  The Court finds that it more likely that Dr. Kropf was already burned out from juggling

her professional and personal obligations, such that she was unable to cope with the dissolution

of her friendship with Dr. Fung and his change in treatment towards her, and opted to walk away

from work and, in her words, "be free."  Exhibit 145 at Fung 570.

Additionally, the absence of any corroboration for the Plaintiff's version of events

significantly undermines Dr. Kropf's claims.  In the weeks that followed Dr. Martin's disclosure

of the uncomfortable situation in at Dr. Fung's condo after *IVV*, Dr. Kropf exchanged numerous

text messages, emails, and notes with Dr. Fung and other members of the Fox Chase and Temple

community.  Not one of these writings contains any reference—directly or indirectly—to Dr.

---

[12] The Court emphasizes here that Dr. Kropf complained that Dr. Fung was refusing to speak to her at work, undermining her with her colleagues, and checking up on her.  There was no allegation at trial that Dr. Fung was sexually harassing Dr. Kropf.

[13] Dr. Kropf testified that her job in the BMT Program was "[her] life," saying "It was everything I had worked for.  I had an enormous number of patients.  I loved my job.  I loved my patients.  I liked the people I worked with."  Tr. (July 28, 2021) at p. 58.

Martin or the events in Dr. Fung's condominium.  Nor are there any communications that reflect

a concern about sexual misconduct, harassment, or discrimination.  To the contrary, as detailed

above (*see supra* pp. 19–20, 21, 22), several contemporaneous writings explicitly reference Dr.

Kropf's falling-out with Dr. Fung because of the fight she had with Ms. Toymil-Rodriguez.  For

example, in Dr. Kropf's June 13, 2018 email to Dr. Fung and Mr. Dugan, Dr. Kropf wrote that

Dr. Fung's mistreatment of her in the workplace started "after your friend shared details with me

that never should have been discussed."  Exhibit 45.

Further, Dr. Kropf did not use her connection to the most powerful person at TUHS and

Fox Chase—Dr. Kaiser—to pursue her claimed belief that there was illegal harassment and

discrimination in the BMT Program.  In May of 2018, Dr. Kropf said that Dr. Kaiser, the Dean

of the Temple University Medical School, CEO of TUHS, and the boss of all the physicians and

other staff at Fox Chase, "loved [her]" and would "do ANYTHING for [her]."  Tr. (July 28,

2021) at p. 105; Exhibit 145 at Fung 580.  Dr. Kaiser was extremely upset about Dr. Kropf's

resignation, felt that Dr. Kropf was an asset to the BMT Program, and thought that "Henry Fung

[was] the problem."  Exhibit 120.  Dr. Kropf and Dr. Kaiser spoke after Dr. Kropf resigned and

before she stopped working.  Exhibit 148.  Dr. Kropf's conversation with Dr. Kaiser about her

resignation was "[v]ery loud and emotional" and Dr. Kropf said that Dr. Kaiser "won't accept

my resignation."  Exhibit 148.  Dr. Kaiser testified that he knew Dr. Fung had a reputation as

being a "difficult administrator," but he had no reason to worry that Dr. Fung was harassing staff

or committing sexual misconduct.  Tr. (July 27, 2021) at pp. 107, 109–10.  If Dr. Kropf truly had

concerns at the time about serious sexual misconduct, harassment, or discrimination, she could

have told the "the top guy" directly during their conversation, and he likely would have been on

her side and acted to help her.  Dr. Kropf did not provide a credible reason for her failure to raise her alleged concerns to Dr. Kaiser.[14]

In sum, the Court finds that Dr. Kropf has not proved by a preponderance of the evidence that she ever complained about conduct prohibited under Title VII or conduct that she could have reasonably believed was prohibited.  The only evidence Plaintiff brought forward to support her version of events is her own uncorroborated testimony, which was contradicted by the testimony of other witnesses and the circumstantial evidence.  The Court finds it more likely that her complaints to and about Dr. Fung were of an interpersonal nature, stemming from her perception of his betrayal in confiding his concerns about her to Ms. Toymil-Rodriguez, the subsequent dissolution of their close friendship, and the change in Dr. Fung's treatment towards her in the workplace.  Dr. Kropf failed to show that she based any of her complaints on concerns about sexual misconduct, harassment, or discrimination, the post-*IVV* incident, or the culture of the BMT Program.  As the Court finds there is insufficient credible evidence to prove these conversations happened as Plaintiff described them, it will not assess whether they would constitute protected activity if they had happened as Plaintiff testified or if Dr. Fung's treatment of her was an adverse employment action.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court rules that the Defendants did not retaliate against Plaintiff in violation of Title VII, 42 U.S.C. §§ 2000e *et seq*. and the PHRA, 43 Pa. Stat. Ann. §§ 951–63.  Accordingly, judgment will be entered in favor of Defendants.  An appropriate order follows.

---

[14] Dr Kropf also had a connection to Patrick O'Connor, the Chairman of the Board of Trustees of Temple University but did not raise any concerns to him about sexual harassment, discrimination, or misconduct in the BMT Program.  Exhibit 145 at Fung 471; Tr. (July 28, 2021) at pp. 105–06.

**DATED:**     11/29/2021

**BY THE COURT:**

/s/ Chad F. Kenney

_____

**CHAD F. KENNEY, JUDGE**